**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **SUMMIT, INC. and** | ) | |
| **PETER COULOPOULOS,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United

States and through the undersigned attorneys acting at the request of the Administrator of the

United States Environmental Protection Agency, files this Complaint and alleges as follows:

<u>NATURE OF THIS ACTION</u>

1.      This is a civil action brought pursuant to Section 3008(a) and (g) of the Resource

Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928(a), (g), against Summit, Inc.

("Summit") and Summit's general manager, Peter Coulopoulos (collectively "Defendants").  The

United States seeks injunctive relief and the assessment of civil penalties for environmental

violations at Summit's automobile scrap recycling facility located in Gary, Indiana.

2.      As set forth below, Defendants have violated the statutory and regulatory

requirements applicable to the management and disposal of hazardous waste and the handling of

used oil, found at 329 IAC §§ 3.1 and 13; 40 C.F.R. Parts 260 through 279; and

Sections 3002-3005 and 3014 of RCRA, 42 U.S.C. §§ 6922-6925, 6935.

- 1 -

3.      This action stems from Summit's failure to comply with an agreed administrative settlement that Summit and EPA signed in March 2016.  Summit, through its general manager, Mr. Coulopoulos, agreed to settle EPA's claims through an administrative process whereby Summit would pay a civil penalty; comply with applicable requirements of RCRA; properly label, store, and handle its hazardous waste; and submit necessary documentation and permit applications to EPA and the relevant state authority, as required under RCRA.  Since entering into the administrative settlement in March 2016, Summit, and its general manager Mr. Coulopoulos, have done none of these things.  The United States therefore brings this judicial action to enforce the terms of Summit's administrative settlement and to seek civil penalties and injunctive relief to abate the environmental harm caused by Summit's and Mr. Coulopoulos' failure to comply with applicable statutory and regulatory requirements.

<u>DEFENDANTS</u>

4.      Defendant Summit is a corporation doing business and incorporated in the State of Indiana.  Summit is a "person" within the meaning of 329 IAC § 3.1-4-1, 40 C.F.R. 260.10, and Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).  Summit operates the Summit facility located at 6901 West Chicago Ave., Gary, Indiana.

5.      Defendant Peter Coulopoulos is a citizen of the State of Indiana, residing in Valparaiso, Indiana.  Mr. Coulopoulos is the general manager of Summit, and is responsible for Summit's compliance with environmental regulations and permit requirements. Mr. Coulopoulos is a "person" within the meaning of 329 IAC § 3.1-4-1, 40 C.F.R. 260.10, and Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

<u>NOTICE, JURISDICTION, AND VENUE</u>

6.      The United States has provided notice to the State of Indiana prior to the commencement of this action in accordance with RCRA Section 3008(a)(2), 42 U.S.C. § 6928(a)(2).

7.      This Court has jurisdiction over the parties and the subject matter of this action pursuant to RCRA Section 3008(a), 42 U.S.C. § 6928(a), and 28 U.S.C. §§ 1331 (federal question jurisdiction), 1345 (jurisdiction when the United States is a plaintiff), and 1355 (jurisdiction over penalties arising under federal claims).

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and RCRA Section 3008(a)(1), 42 U.S.C. § 6928(a)(1), because Defendants are located and are doing business in this District and the violations occurred in this District.

9.      Authority to bring this civil action is vested in the Attorney General of the United States pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and 28 U.S.C. §§ 516 and 519.

<u>STATUTORY AND REGULATORY BACKGROUND</u>

*RCRA Statutory and Regulatory Framework*

10.      Federal regulation of hazardous waste is primarily based on RCRA, enacted on October 21, 1976 to amend the Solid Waste Disposal Act, and on the Hazardous and Solid Waste Amendments ("HSWA") enacted by Congress in 1984 to further amend the Solid Waste Disposal Act.  RCRA establishes a "cradle to grave" program to be administered by the Administrator of EPA and authorized states for regulating the generation, transportation, treatment, storage, and disposal of hazardous waste and the proper handling of used oil.  *See* 42 U.S.C. § 6901 *et seq*.

11.     RCRA's Subchapter III (RCRA §§ 3001-3023, 42 U.S.C. §§ 6921-6939g, known as "Subtitle C") required EPA to promulgate regulations establishing performance standards applicable to facilities that generate, transport, treat, store, or dispose of hazardous wastes and manage used oil.  Together, RCRA Subtitle C and its implementing regulations, set forth at 40 C.F.R. Parts 260-279, comprise EPA's RCRA hazardous waste program.

12.     RCRA Section 3006, 42 U.S.C. § 6926, allows the Administrator to authorize a state to administer its own hazardous waste program in lieu of the federal program when the Administrator deems the state program to be equivalent to and consistent with the federal program.

13.     Pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), the Administrator granted the State of Indiana, through the Indiana Department of Environmental Management (IDEM), final authorization to administer a state hazardous waste program in lieu of the federal government's base RCRA program effective January 31, 1986, 51 Fed. Reg. 3778 (January 31, 1986).  The federally-authorized Indiana regulations that govern generators of hazardous waste are codified at 329 IAC § 3.1-7-1 *et seq*.  The federally-authorized Indiana regulations that govern facilities that treat, store, or dispose of hazardous waste, and that govern the owners and operators of such facilities, are codified at 329 IAC §§ 3.1-9-1 *et seq*.  (Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities), and 329 IAC §§ 3.1-10-1 *et seq*. (Interim Status Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities).  The federally-authorized Indiana regulations that govern companies that generate and manage used oil are codified at 329 IAC § 13 *et seq.* (Used Oil Management).

14.     Facilities that treat, store, or dispose of hazardous waste must obtain either a permit or interim status pursuant to 329 IAC § 3.1-13-1 *et seq*. and 40 C.F.R. § 270.1, and Section 3005 of RCRA, 42 U.S.C. § 6925.

*Enforcement of RCRA*

15.     Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), provides the United States on behalf of EPA with the authority to enforce State regulations in those States authorized to administer a hazardous waste program.  Any violations of regulations promulgated pursuant to Subtitle C, Sections 3001-3024 of RCRA, 42 U.S.C. §§ 6921-6039g, or any State program approved by EPA pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, constitutes a violation of RCRA, subject to the assessment of civil or criminal penalties and compliance orders as provided in Section 3008 of RCRA, 42 U.S.C. § 6928.

16.     Under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), EPA may issue an order assessing a civil penalty for any past or current violation, and/or requiring compliance immediately or within a specified period of time.

17.     Under Section 3008(c) of RCRA, 42 U.S.C. § 6928(c), any person who fails to take corrective action within the time specified in a compliance order may be assessed a civil penalty for each day of continued noncompliance with the order.

18.     Pursuant to Sections 3008(a) and (g) and 3006(g) of RCRA, 42 U.S.C. §§ 6928(a) and (g) and 6926(g), the United States may enforce the federally-approved Indiana hazardous waste program, as well as the federal regulations that remain effective in Indiana, by filing a civil action in United States District Court seeking injunctive relief and/or civil penalties not to exceed $25,000 per day per violation.  Each day of such violation constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

19. The maximum civil penalty amount in Section 3008(g) of RCRA, 42 U.S.C. § 9628(g), has been adjusted as required by the Federal Civil Penalties Inflations Adjustment Act of 1990 (28 U.S.C. § 2461, note; Pub. L. 101-410), as amended by the Debt Collection Improvement Act of 1996, and most recently, by the Federal Civil Penalties Inflation Adjustment Improvements Act of 2015 (28 U.S.C. § 2461 note; Pub. L. 114-74, Section 701). EPA promulgated the adjustments at 40 C.F.R. Part 19. Pursuant to Part 19, the United States may seek civil penalties of up to $70,117 per day for each violation of Subchapter III of RCRA occurring on or after November 3, 2015 through January 14, 2017; up to $71,264 per day for each violation of Subchapter III of RCRA occurring on or after January 15, 2017 through January 14, 2018; up to $72,718 per day for each violation of Subchapter III of RCRA occurring on or after January 15, 2018 through January 14, 2019; and up to $74,552 per day for each violation of Subchapter III of RCRA occurring on or after February 6, 2019.

*Applicable Federal and Indiana Regulations*

20. The Indiana regulations at 329 IAC § 3.1-4-1, and the federal regulations at 40 C.F.R. § 260.10, define an "operator" as the person responsible for the overall operation of a facility.

21. The Indiana regulations at 329 IAC § 3.1-4-1, and the federal regulations at 40 C.F.R. § 260.10, define "facility" as, *inter alia*, all contiguous land and structures, other appurtenances, and improvements on the land used for treating, storing, or disposing of hazardous waste.

22. The Indiana regulations at 329 IAC §§ 3.1-4-1 and 3.1-6-1 *et seq.*, and the federal regulations at 40 C.F.R. § 261.2, define the term "solid waste" as any discarded material that is not excluded by 40 C.F.R. § 261.4(a) or that is not excluded by variance granted under 40 C.F.R.

§§ 260.30 and 260.31 or that is not excluded by a non-waste determination under §§ 260.30 and 260.34.

23.     The Indiana regulations at 329 IAC § 3.1-6-1, and the federal regulations at 40 C.F.R. § 261.3, define a solid waste as "hazardous waste" if, *inter alia*, (1) it is not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b); (2) it exhibits any of the characteristics of hazardous waste identified in 40 C.F.R. Part 261, Subpart C, §§ 261.20 to 261.24 (i.e., the characteristics of ignitability, corrosivity, reactivity, or toxicity); (3) it is listed under 40 C.F.R. Part 261, Subpart D, and has not been excluded from the lists in subpart D by virtue of 40 C.F.R. §§ 260.20 and 260.22; or (4) it is a mixture of a solid waste and one or more hazardous wastes listed under 40 C.F.R. Part 261, Subpart D.

24.     The Indiana regulation found at 329 IAC § 3.1-4-1, and the federal regulations at 40 C.F.R. § 260.10, define "storage" as the holding of hazardous waste for a temporary period at the end of which the hazardous waste is treated, disposed of, or stored elsewhere.

25.     The Indiana regulations found at 329 IAC § 3.1-13-1 and 3.1-13-3(e) and (f), and the federal regulations at 40 C.F.R. §§ 270.1(c) and 270.10(e) and (f), prohibit storage or disposal of hazardous waste by any person who has not applied for or received a permit for the hazardous waste management activity.

26.     The Indiana regulations found at 329 IAC § 3.1-10-1, and the federal regulations found at 40 C.F.R. § 265.1, require that a person who stores or disposes of hazardous waste must comply with the interim status regulations found at 40 C.F.R. Part 265 until it has been issued a permit for its hazardous waste management activity.

27.     The Indiana regulations found at 329 IAC § 13-2-19, and the federal regulations at 40 C.F.R. §279.1, define "used oil" as any oil that has been refined from crude or synthetic oil that has been used and as a result of such use is contaminated by physical or chemical impurities.

28.     The Indiana regulations found at 329 IAC § 13-2-9, and the federal regulations at 40 C.F.R. §279.1, define "used oil generator" as any person by site, whose act or process produces used oil or whose act first causes used oil to become subject to regulation.

29.     The Indiana regulations found at 329 IAC § 13-4-3(e), and the federal regulations at 40 C.F.R. §279.22(d), require a used oil generator upon detection of a release of used oil to *inter alia* clean up and manage properly the releases of used oil and other materials.

<u>GENERAL ALLEGATIONS</u>

30.     Summit, Inc. is an automobile scrap recycling facility located at 6901 West Chicago Avenue, Gary, Indiana (hereinafter referred to as "the Summit Site" or "Site").  At all times relevant to this complaint, Mr. Couloupoulos was the general manager of Summit and a person responsible for Summit's compliance with environmental laws and regulations.  In addition to signing, as general manager, administrative environmental settlements with EPA and IDEM, Mr. Couloupoulos signed, as Summit's general manager, responses to EPA's information requests, Clean Air Act permit renewal applications, IDEM quarterly dust reports and other reports, federally-enforceable state operating permit annual compliance certifications, hazardous waste notifications, and letters and forms submitted to IDEM concerning environmental matters. Also, Mr. Couloupoulos served as company representative throughout EPA's administrative enforcement action against Summit.

31.     The property where Summit conducts scrap recycling is bounded on the north by Chicago Avenue, on the northeast by Industrial Avenue (also referred to as U.S. Route 12 or

Airport Road), and on the southeast by the E & J Railroad and the Gary Airport.  It is approximately 40 acres.

32.     At all times relevant to this Complaint, Summit repurchased automobiles and drained and/or collected gasoline, batteries, mercury, catalytic converters and tires with aluminum wheels from the automobiles.  After removing these items from the repurchased automobiles, Summit shredded the vehicles on site or crushed them for delivery to a shredding company.

33.     At all times relevant to this Complaint, Summit's operations generated liquids such as engine crankcase oils, anti-freeze, transmission and power steering fluids and windshield wiper fluid from its automobile crushing operations.  These fluids were not removed from automobiles prior to crushing.

34.      At all times relevant to this Complaint, Summit has stored and/or disposed of hazardous waste without applying for or receiving a permit for hazardous waste management activity, in violation of 329 IAC § 3.13-1 and 40 C.F.R. §§ 270.1(c) and 270.10(e) and (f) and without complying with the interim status regulations in violation of 329 IAC § 3.1-10-1 and the federal regulations found at 40 C.F.R. § 265.

*EPA Inspections and Investigation of Summit*

35.     On or about April 2, 2008, EPA conducted an inspection at the Summit Site.  EPA conducted a subsequent sampling inspection at the Summit Site on March 18, 2009.  During the March 18, 2009 sampling inspection EPA collected several samples from the drums used to store liquids on site and observed and documented site conditions.

36.     Subsequent analysis confirmed the drums EPA sampled contained solid waste as defined by 320 IAC § 3.1-6-1 and 40 C.F.R. § 261.2 and hazardous waste as defined by 329 IAC § 3.1-6-1, and the federal regulations at 40 C.F.R. § 261.3.

*EPA's Administrative Prosecution of Summit*

37.     Based on the investigations performed by EPA and referenced in Paragraphs 35 and 36 of this Complaint, on March 17, 2014, EPA initiated an administrative enforcement action under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), against Summit for failure to comply with Sections 3002-3005 and 3014 of RCRA, 42 U.S.C. §§ 6922-6925, 6935, and the corresponding RCRA implementing regulations.  EPA's administrative complaint is attached to this Complaint as Exhibit 1.  The administrative complaint sets forth a detailed account of EPA's investigation of the Summit Site and operations at paragraphs 31 through 66.

38.     EPA's administrative complaint alleged seven counts.  Counts 1-4 alleged violations of the hazardous waste management regulations, 40 C.F.R. §§ 260-265.  EPA alleged that Summit failed to make a proper waste characterization (count 1); failed to have and use an EPA Identification Number (count 2); failed to use the Uniform National Hazardous Waste Manifest (count 3); and failed to have a hazardous waste permit since it did not qualify for the permit exemption found in 40 C.F.R. § 262.34 (count 4).

39.     Counts 5 and 6 of EPA's administrative complaint alleged violations of the used oil management standards applicable to generators of used oil pursuant to 40 C.F.R. § 279.  EPA alleged that Summit failed to label several 55-gallon drums and containers as used oil (count 5) and failed to adequately clean up and respond to releases of used oil and other materials (count 6).  Count 7 of EPA's administrative complaint alleged violations of the universal waste management standards applicable to small quantity generators of spent lead acid batteries

- 10 -

pursuant to 40 C.F.R. § 273.  The administrative complaint also sought a civil penalty in the amount of $263,375.

40.     Summit filed its answer to the administrative complaint on April 17, 2014 and requested an administrative hearing.

41.     On October 21, 2014, EPA filed a motion for accelerated decision as to liability for Counts 1-7 of the administrative complaint.  Summit did not file a response to the motion. On July 24, 2015, the Administrative Law Judge (ALJ) issued a decision granting accelerated decision on counts 1 and 5-7 and partial accelerated decision on count 4 but denying accelerated decision as to the remainder of the administrative complaint.  The ALJ held that Summit was a hazardous waste storage facility operating without a permit and therefore in violation of the permit requirements of Section 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a), (e) and 40 C.F.R. § 270.1.

42.     On March 8, 2016, the ALJ convened an administrative hearing on EPA's complaint.  Counsel for Summit was present along with Peter Coulopoulos, Summit's general manager, but counsel did not introduce any exhibits or call any witnesses and did not present any defense.  After discussing preliminary procedural matters on the record, counsel for Summit informed the ALJ that Summit would agree to pay the full $263,375 civil penalty in EPA's administrative complaint and would negotiate an agreed compliance order.

43.     Counsel for Summit stated on the record that Summit recognized it was improperly handling used oil, needed an EPA ID number and a permit, and needed to take other steps to comply with RCRA.  Counsel for Summit admitted to the facts and violations alleged in EPA's administrative complaint.

44.     The ALJ granted the parties a brief recess to negotiate a compliance order.  The parties completed and signed a Consent Agreement and Final Order (CAFO) by the end of the day on March 8, 2016.  Peter Coulopoulos, as general manager of Summit, signed the CAFO on behalf of Summit on March 8, 2016.  The EPA Regional Administrator signed the CAFO on March 9, 2016, and it was filed with the Regional Hearing Clerk on March 10, 2016.  The CAFO was sent to Peter Coulopoulos on behalf of Summit by certified mail on March 10, 2016.  The CAFO is attached to this Complaint as Exhibit 2.

45.     In the signed CAFO, Summit withdrew its Answer to EPA's administrative complaint and admitted to the allegations contained in the complaint.  Summit agreed to pay the civil penalty of $263,375 within 30 days of the effective date of the CAFO.  Summit also agreed to a RCRA compliance plan contained in paragraphs 14-18 of the CAFO, and summarized as follows:

a.  No later than March 10, 2016, Summit would comply with the hazardous waste, used oil, and universal waste container labeling requirements;

b.  No later than March 25, 2016, Summit would complete a Notification of Regulated Waste Activity, EPA SF 8600-12, including identification of itself as a hazardous waste storage facility and large quantity generator;

c.  No later than March 25, 2016, Summit would submit to EPA a closure plan for review and approval for certain areas of the Site designated as areas A and B;

d. No later than April 11, 2016, Summit would submit for review and approval a contingency plan and employee training plan covering hazardous waste, used oil and universal waste and a list of portable crushers it owned and leased;

e. No later than April 11, 2016, Summit would pay a civil penalty of $263,375; and

f. No later than June 10, 2016, Summit would begin to submit quarterly crusher reports, with additional reports due September 12, 2016, December 12, 2016, and March 10, 2017.

*Defendants' Conduct Post-Consent Agreement and Final Order*

46.     On March 25, 2016, EPA received from Summit a copy of a March 23, 2016 notification that Summit submitted to IDEM.  The notification included a RCRA Subtitle C Site Identification Form and an undated Environmental Compliance Training Plan for Summit, listing Peter Coulopoulos as the facility contact person and general manager.  The notification did not satisfy the requirements contained in Paragraph 17 of the CAFO, as it did not identify Summit as a hazardous waste storage facility.  The Environmental Compliance Training Plan did not satisfy the requirements for an employee training plan contained in Paragraph 14 of the CAFO, as it did not comply with 329 IAC 3.1-10-1, and the federal regulations found at 40 C.F.R. § 265.16(a) and (d).

47.     Summit failed to submit any other deliverables to EPA as required by the CAFO. To date, Summit has failed to comply with any requirements of the signed CAFO.  Summit has not paid the civil penalty of $263,375.

48.     On April 27, 2016, EPA issued a Notice of Violation (NOV) to Peter Coulopoulos as general manager of Summit, stating that Summit was in violation of the CAFO.  Counsel for Summit received the NOV on April 27, 2016.  Mr. Coulopoulos received a copy of the NOV on April 29, 2016.

49.     On or about April 22 and May 19, 2016, EPA's Cincinnati Finance Center sent Summit and Summit's counsel Notices of Delinquency regarding the civil penalty payment. These notices were received by Summit and Summit's counsel on April 26 and May 24, 2016, respectively.  On June 22, 2016, EPA's Cincinnati Finance Center sent a Final Notice of Delinquency to Summit and Summit's counsel.  Summit's counsel received the Final Notice on June 25, 2016.  The Final Notice sent to Summit was returned as undeliverable on July 18, 2016. Summit remains in business at the address listed in Paragraph 4 of this Complaint and has an active business website and telephone number.

<u>FIRST CLAIM FOR RELIEF</u>

*Failure to Comply with Consent Agreement and Final Order*

50.     Paragraphs 1 through 49 are re-alleged and incorporated herein.

51.     By failing to comply with the requirements of EPA's lawfully issued compliance order, as embodied in the March 10, 2016 CAFO, Summit has violated and continues to violate RCRA Section 3008(a), 42 U.S.C. § 6928(a), subjecting it to injunctive relief measures and civil penalties not to exceed $70,117 per day for each such violation occurring on or after November 3, 2015 through January 14, 2017; up to $71,264 per day for each such violation occurring on or after January 15, 2017 through January 14, 2018; and up to $72,718 per day for each such violation occurring on or after January 15, 2018.  Each day of such violation constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

52.     As general manager responsible for environmental compliance at Summit, and as signatory to the CAFO on behalf of Summit, Mr. Coulopoulos was directly and personally involved in Summit's failure to comply with the requirements of EPA's lawfully issued compliance order, as embodied in the March 10, 2016 CAFO.  As such, Mr. Coulopoulos is individually liable as a person who has violated and continues to violate RCRA Section 3008(a), 42 U.S.C. § 6928(a), subjecting him to injunctive relief measures and civil penalties not to exceed $70,117 per day for each such violation occurring on or after November 3, 2015 through January 14, 2017; up to $71,264 per day for each such violation occurring on or after January 15, 2017 through January 14, 2018; up to $72,718 per day for each such violation occurring on or after January 15, 2018; and up to $74,552 per day for each violation occurring on or after February 6, 2019 .  Each day of such violation constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

<u>SECOND CLAIM FOR RELIEF</u>

*Operating without a Hazardous Waste Permit*

53.     Paragraphs 1 through 49 are re-alleged and incorporated herein.

54.     Pursuant to the signed CAFO, Summit has agreed that it was a hazardous waste storage facility operating without a permit at the time of EPA's 2009 inspection.  A facility continues as a hazardous waste facility until such time that it certifies clean closure.  *See* 329 IAC § 3.1-1-10-1 and the federal regulations at 40 C.F.R. §§ 265.1 and 265.115.

55.     Summit has failed to certify clean closure of Summit's hazardous waste storage area pursuant to RCRA, and therefore continues to operate a hazardous waste storage area without a RCRA permit and without submitting a RCRA permit application, in violation of

Section 3005 (a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (e), 329 IAC § 3.13-1, and the federal regulations found at 40 C.F.R. §§ 270.1(c) and 270.10(e) and (f).

56.     As general manager responsible for environmental compliance at Summit, Mr. Coulopoulos was directly and personally involved in Summit's failure to certify clean closure of Summit's hazardous waste storage area pursuant to RCRA, and directly and personally involved in Summit's continued operation of a hazardous waste storage area without a RCRA permit and without submitting a RCRA permit application, in violation of Section 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (e), 329 IAC § 3.13-1, and the federal regulations found at 40 C.F.R. §§ 270.1(c) and 270.10(e) and (f).  As such, Mr. Coulopoulos is individually liable as a person who has violated and continues to violate the clean closure certification requirements of RCRA.

57.     Summit's continued operation without a hazardous waste permit and Summit's and Mr. Coulopoulos' failure to certify clean closure as required by the CAFO and RCRA requirements subject Summit and Mr. Coulopoulos to injunctive relief measures and to civil penalties not to exceed $70,117 per day for each such violation occurring on or after November 3, 2015 through January 14, 2017; up to $71,264 per day for each such violation occurring on or after January 15, 2017 through January 14, 2018; up to $72,718 per day for each such violation occurring on or after January 15, 2018; and up to $74,552 per day for each violation occurring on or after February 6, 2019.  Each day of such violation constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

<u>THIRD CLAIM FOR RELIEF</u>

*Failure to Comply with Interim Status Regulations*

58.     Paragraphs 1 through 49 are re-alleged and incorporated herein.

59.     Pursuant to the signed CAFO, Summit has agreed that it was not in compliance with interim status standards applicable to unpermitted facilities until such time that a permit is issued.  The signed CAFO contains a compliance plan designed to return Summit to compliance with the interim status contingency plan, employee training plan, closure plan, and notification requirements.  Summit has failed to comply with those provisions of the CAFO.

60.     By failing to comply with the contingency, training, and closure plan requirements of the CAFO and interim status requirements of RCRA, Summit has violated and continues to violate the interim status requirements of RCRA Section 3005(e), 42 U.S.C. § 6925(e), and 329 IAC § 3.1-10-1 and the federal regulations promulgated at 40 C.F.R. § 265, Subparts B, D, and G.

61.     As general manager responsible for environmental compliance at Summit, Mr. Coulopoulos was directly and personally involved in Summit's failure to comply with the contingency, training, and closure plan requirements of the CAFO and interim status requirements of RCRA.  As such, Mr. Coulopoulos is individually liable as a person who has violated and continues to violate the interim status requirements of RCRA Section 3005(e), 42 U.S.C. § 6925(e), and 329 IAC § 3.1-10-1 and the federal regulations promulgated at 40 C.F.R. § 265, Subparts B, D, and G.

62.     Summit's and Mr. Coulopoulos' continued failure to comply with the interim status regulations and requirements of the CAFO subjects Summit and Mr. Coulopoulos to injunctive relief measures and to civil penalties not to exceed $70,117 per day for each such violation occurring on or after November 3, 2015 through January 14, 2017; up to $71,264 per day for each such violation occurring on or after January 15, 2017 through January 14, 2018; up to $72,718 per day for each such violation occurring on or after January 15, 2018; and up to

$74,552 per day for each violation occurring on or after February 6, 2019.  Each day of such

violation constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C.

§ 6928(g).

## FOURTH CLAIM FOR RELIEF

### *Failure to Clean Up Released Oil*

63.    Paragraphs 1 through 49 are re-alleged and incorporated herein.

64.    During the course of EPA's investigation of the Summit Site, EPA observed

extensive staining of soils with used oils.  Summit admitted to these facts and the underlying

violations in the signed CAFO.  The CAFO identifies two areas of the Site (Areas A and B)

where released oils are to be removed.  By signing the CAFO, Summit agreed to undertake the

necessary removal and cleanup.

65.    Since entry of the signed CAFO, Summit has not submitted to EPA any

information demonstrating that the released used oils in these areas have been properly cleaned

up or removed.  The closure plan required for Areas A and B under the CAFO would have

addressed these releases.  On information and belief, Summit has failed to implement the closure

plan required by the CAFO and RCRA requirements and has failed to remove or clean up

released used oils that remain on site in violation of 329 IAC § 13-4-3(e), and the federal

regulations found at 40 C.F.R. § 279.22(d).

66.    As general manager responsible for environmental compliance at Summit,

Mr. Coulopoulos was directly and personally involved in Summit's failure to implement the

closure plan required by the CAFO and RCRA requirements and failure to remove or clean up

released used oils that remain on site in violation of 329 IAC § 13-4-3(e), and the federal

regulations found at 40 C.F.R. § 279.22(d).  As such, Mr. Coulopoulos is individually liable as a

person who has violated and continues to violate the CAFO and RCRA requirements to implement the closure plan and to remove or clean up released used oils that remain on site.

67.     Summit's and Mr. Couloupolis' continued failure to address released used oils in Areas A and B of the Summit Site subjects Summit and Mr. Coulopoulos to injunctive relief measures and to civil penalties not to exceed $70,117 per day for each such violation occurring on or after November 3, 2015 through January 14, 2017; up to $71,264 per day for each such violation occurring on or after January 15, 2017 through January 14, 2018; up to $72,718 per day for each such violation occurring on or after January 15, 2018; and up to $74,552 per day for each violation occurring on or after February 6, 2019.  Each day of such violation constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff the United States of America respectfully requests that this Court:

1.     Order the Defendants to immediately comply with the statutory and regulatory requirements cited in this Complaint;

2.     Order the Defendants to immediately comply with the terms of the Consent Agreement and Final Order as agreed to by the Defendants and issued by the EPA on March 10, 2016;

3.     Assess civil penalties against the Defendants for up to the amounts provided pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. Part 19; and

4.    Grant the United States such other relief as this Court deems just and proper.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division


THOMAS L. KIRSCH II
United States Attorney

WAYNE T. AULT
Assistant United States Attorney
Northern District of Indiana
5400 Federal Plaza
Hammond, IN 46320
Phone: 219-937-5500
Fax: 219-852-2770
Email: wayne.ault@usdoj.gov

OF COUNSEL:

RICHARD CLARIZIO
MARK KOLLER
JILLIAN ROUNTREE
Associate Regional Counsel
U.S. Environmental Protection Agency, Region V
77 W. Jackson Blvd.
Chicago, IL 60604

# EXHIBIT 1



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

MAR 1 4 2014

REPLY TO THE ATTENTION OF:

## ENFORCEMENT CONFIDENTIAL

**DATE:**

**SUBJECT:**    RCRA Administrative Complaint for Summit, Incorporated
Gary, Indiana

**FROM:**    Gary J. Victorine, Chief
RCRA Branch

**TO:**    Margaret M. Guerriero, Director
Land and Chemicals Division

The attached Complaint and Compliance Order (Complaint) alleges several violations of the
Resource Conservation and Recovery Act (RCRA) as amended, 42 U.S.C. § 6901 *et seq*. The
alleged violations are based on the results of a sampling inspection conducted on March 18,
2009, and information the facility provided in response to three information requests.

Summit, Incorporated (Summit) operates an automotive scrap recycling business in Gary,
Indiana. Summit stored hazardous waste without a hazardous waste permit by failing to comply
with the permit exemption conditions. Specifically, Summit failed to properly label several
drums of hazardous waste; failed to have a contingency plan; failed to provide initial and annual
hazardous waste training to its staff; and failed to conduct weekly inspections of its hazardous
waste storage area.

Summit also failed to make a hazardous waste determination; offered hazardous waste for
transportation without an EPA identification number; shipped hazardous waste without a
manifest; stored used oil in unmarked containers; failed to contain used oil releases; and failed to
comply with the standards for small quantity handlers of universal waste.

EPA is proposing a penalty of $263,375 for the above listed violations. We recommend that you
sign this Complaint.

Please return the Complaint package to the RCRA Branch for distribution.

Attachment

Recycled/Recyclable • Printed with Vegetable Oil Based Inks on 100% Recycled Paper (100% Post-Consumer)

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

**MAR 1 7 2014**

REPLY TO THE ATTENTION OF:

Mr. Peter Coulopoulos
Summit Inc.
6901 West Chicago Avenue
Gary, Indiana 46406

Re: Complaint and Compliance Order     **RCRA-05-2014-0006**
Summit Inc.
U.S. EPA ID No.: INX 000028902

Dear Mr. Coulopoulos:

Enclosed is a Complaint and Compliance Order (Complaint) under Section 3008(a) of the Solid
Waste Disposal Act, as amended, also known as the Resource Conversation and Recovery Act
(RCRA), 42 U.S.C § 6928(a). The Complaint alleges violations of RCRA, 42 U.S.C § 6901 *et
seq.*

As provided in the Complaint, if you would like to request a hearing, you must do so in the
Answer to the Complaint. Please note that if you do not file an Answer with the Regional
Hearing Clerk (E-19J), U.S. EPA, Region 5, 77 West Jackson Boulevard, Chicago, Illinois
60604, within thirty (30) days of receipt of this Complaint, a default order may be issued and the
proposed civil penalty will become due 30 days later.

Regardless of whether you choose to file an answer and request a hearing within thirty (30) days
of receiving the complaint, EPA extends you the opportunity to continue settlement discussions.
A request for an informal settlement conference with EPA will not affect or extend the 30 day
deadline to file an Answer.

In addition, whether or not you request a hearing, you may request an informal settlement
conference.

To request an informal settlement conference, or if you have any questions about this matter, you may contact Spiros Bourgikos, at (312) 886-6862.

Sincerely,

Gary J. Victorine, Chief
RCRA Branch

Enclosures

cc: Nancy Johnston, IDEM (njohnsto@idem.in.gov)

2

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 5

In the Matter of:                                    )        Docket No. RCRA-05-2014-0006
                                                     )
                                                     )        Proceeding to Assess a Civil Penalty
Summit, Inc.                                         )        Under Section 3008(a) of the Resource
6901 West Chicago Avenue                             )        Conservation and Recovery Act,
Gary, Indiana                                        )        42 U.S.C. § 6928(a)
                                                     )
U.S. EPA ID #: INX 000 028 902                       )
                                                     )
        Respondent.                                  )
                                                     )

**Complaint and Compliance Order**

**Preliminary Statement**

1.      This is a civil administrative action instituted under Section 3008(a) of the Solid

Waste Disposal Act, as amended, also known as the Resource Conservation and Recovery Act,

as amended (RCRA), 42 U.S.C. § 6928(a).  This action is also instituted under Sections

22.1(a)(4), 22.13 and 22.37 of the "Consolidated Rules of Practice Governing the Administrative

Assessment of Civil Penalties and the Revocation/Termination or Suspension of Permits"

(Consolidated Rules), codified at 40 C.F.R. Part 22.

2.      The Complainant is by lawful delegation the Director of the Land and Chemicals

Division, United States Environmental Protection Agency (U.S. EPA), Region 5.

3.      U.S. EPA provided notice of commencement of this action to the State of Indiana

pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).

4.      Jurisdiction for this action is conferred upon U.S. EPA by Sections 2002(a)(1),

3006(b), 3006(h) and 3008 of RCRA; 42 U.S.C. §§ 6912(a)(1), 6926(b), 6926(h) and 6928.

5.    Respondent is Summit, Inc., a corporation doing business and incorporated in the State of Indiana.

## Statutory and Regulatory Background

6.    U.S. EPA has promulgated regulations, codified at 40 C.F.R. Parts 260 through 279, governing generators and transporters of hazardous waste and facilities that treat, store, or dispose of hazardous waste, including used oil, pursuant to Sections 3002-3005, 3006 and 3014 of RCRA, 42 U.S.C. §§ 6922-6925, 6926 and 6935.

7.    Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, the Administrator of U.S. EPA may authorize a state to administer the RCRA hazardous waste program in lieu of the federal program when the Administrator finds that the state program meets certain conditions. Any violation of regulations promulgated pursuant to Subtitle C (Sections 3001-3023 of RCRA, 42 U.S.C. §§ 6921-6939(e) or any state provision authorized pursuant to Section 3006 of RCRA, constitutes a violation of RCRA, subject to the assessment of civil penalties and issuance of compliance orders as provided in Section 3008 of RCRA, 42 U.S.C. § 6928.

8.    Pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), the Administrator of U.S. EPA granted the State of Indiana final authorization to administer a state hazardous waste program in lieu of the federal government's base RCRA program effective January 31, 1986, 51 Fed. Reg. 3778 (January 31, 1986). The federally-authorized Indiana regulations that govern generators of hazardous waste are codified at 329 IAC § 3.1-7-1 *et seq.* The federally-authorized Indiana regulations that govern facilities that treat, store or dispose of hazardous waste, and that govern the owners and operators of such facilities, are codified at 329 IAC §§ 3.1-9-1 *et seq.* (Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal

Facilities), and 329 IAC §§ 3.1-10-1 *et seq.* (Interim Status Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities).

9.     Facilities that treat, store, or dispose of hazardous waste must obtain either a permit or interim status pursuant to 329 IAC § 3.1-13-1 *et seq.* and 40 C.F.R. § 270.1, and Sections 3005 of RCRA, 42 U.S.C. § 6925.

10.     Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), provides U.S. EPA with the authority to enforce State regulations in those States authorized to administer a hazardous waste program. Any violation of regulations promulgated pursuant to Subtitle C, Sections 3001-3023 of RCRA, 42 U.S.C. §§ 6921-6039, or any State program approved by EPA pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, constitutes a violation of RCRA, subject to the assessment of civil or criminal penalties and compliance orders as provided in § 3008 of RCRA, 42 U.S.C. § 6928.

11.     Under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), U.S. EPA may issue an order assessing a civil penalty for any past or current violation, requiring compliance immediately or within a specified period of time, or both.

12.     The Administrator of U.S. EPA may assess a civil penalty of up to $25,000 per day for each violation of Subtitle C of RCRA according to Section 3008 of RCRA, 42 U.S.C. § 6928. The Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, required U.S. EPA to adjust its penalties for inflation on a periodic basis. Pursuant to the Civil Monetary Penalty Inflation Adjustment Rule, published at 40 C.F.R. Part 19, U.S. EPA may assess a civil penalty of up to $32,500 per day for each violation of Subtitle C of RCRA that occurred after March 15, 2004 and $37,500

per day for each violation of Subtitle C of RCRA that occurred after January 12, 2009. The Indiana regulations at 329 IAC § 3.1-4-20 and 40 C.F.R. §260.10, define a "person"  to include an individual, partnership, corporation, association and other entities.

13.     The Indiana regulations at 329 IAC §3.1-4-1, and 40 C.F.R. § 260.10, define an "operator" as the person responsible for the overall operation of a facility.

14.     The Indiana regulations at 329 IAC §§ 3.4-1 define an "owner" as the person *who owns* a facility or part of a facility.

15.     The Indiana regulations at 329 IAC §§ 3.1-4-1 and 40 C.F.R. § 260.10 define "generator" as any person, by site, whose act or process produces hazardous waste identified or listed in 35 IAC §§ 3.1-6-1 *et seq.* or whose act first causes a hazardous waste to become subject to regulation.

16.     The Indiana regulations at 329 IAC §§ 3.1-4-1 and 40 C.F.R. § 260.10 define "facility" as, *inter alia*, all contiguous land and structures, other appurtenances, and improvements on the land used for treating, storing, or disposing of hazardous waste.

17.     The Indiana regulations at 329 IAC §§ 3.1-4-1 and 3.1-6-1 *et seq.* and 40 C.F.R. § 261.2 define the term "solid waste" as any discarded material that is not excluded by 40 C.F.R. § 261.4(a) or that is not excluded by variance granted under 40 C.F.R. §§ 260.30 and 260.31.

18.     The Indiana regulation at 329  IAC § 3.1-6-1 and 40 C.F.R. § 261.3, defines a solid waste as  a "hazardous waste" if, *inter alia,* (1) it is not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b), and (2) it exhibits any of the characteristics of hazardous waste identified in 40 C.F.R. Part 261, Subpart C, §§ 261.20 to 261.24 (i.e., the characteristics of ignitability, corrosivity,  reactivity, or toxicity), or it is listed under 40 C.F.R.

Part 261, subpart D, and has not been excluded from the lists in subpart D by virtue of 40 C.F.R. §§ 260.20 and 260.22.

19.     The Indiana regulation at 329 IAC § 3.1-6-1, and 40 C.F.R. 261,contains a list of classes and types of hazardous wastes that have been listed on the basis that the class or type of waste is ignitable waste, corrosive waste, reactive waste, toxicity characteristic waste, acute hazardous waste, or toxic waste.

20.     The Indiana regulation found at 329 IAC § 4-1, and 40 C.F.R.  § 260.10 define "storage" as the holding of hazardous waste for a temporary period at the end of which the hazardous waste is treated, disposed of, or stored elsewhere.

21.     The Indiana regulation found at 329 IAC §§ 3.1- 4-1 and 40 C.F.R. § 260.10, define a *hazardous waste management unit* as a contiguous area of land on or in which hazardous waste is placed.  It includes a container storage area.

22.     The Indiana regulation found at  329 IAC §§ 3.13-1, and 40 C.F.R. §§270.1(c) and 270.10(e) and (f) prohibit the treatment, storage, or disposal of hazardous waste by any person who has not applied for or received a permit for the hazardous waste management activity.

23.     The Indiana regulations 329 IAC §§ 3.1-7 and 13-6, 40 C.F.R. §§ 261.5 and 262.34 exempts generators of hazardous waste from the permit requirements if certain conditions are met. The conditions are dependent on the amount of hazardous waste generated or accumulated by the generator in a calendar month. The conditions for large quantity generators (LQG) (i.e., produce or accumulate greater than 1000 kilograms of hazardous waste in a month) are contained in 40 C.F.R. § 262.34(a). The conditions for small quantity generators (SQG) (i.e.,

produce or accumulate between 100 and 1000 kilograms of hazardous waste in a month) are contained in 40 C.F.R. §262.34(d). The conditions for conditionally exempt small quantity generators (CESQG) (i.e., produce less than 100 kilograms of hazardous waste in a month) are contained in 40 C.F.R. §261.5(g)(2)).

## General Allegations

24.     Respondent owns and operates an automobile scrap recycling facility located at 6901 West Chicago Avenue, Gary, Indiana (hereinafter referred to as "the Summit Site" or "Site").

25.     The property where Respondent conducts its scrap recycling business is bounded on the north by Chicago Avenue, on the northeast by Industrial Avenue (also referred to as U.S. Route 12 or Airport Road) and on the Southeast by the E & J Railroad and the Gary Airport.  It is approximately 40 acres.   See Exhibit 1 (Google Earth Maps 2014) and Exhibit 2 (Summit Site Map).

26.     There are wetland areas on or near the southern portion of the site.  During the inspection there were frogs present.

27.     Respondent does not have a wastewater treatment system on site.  It does not have a permit for the discharge of pollutants to the waters of the United States.

28.     At all times relevant to this Complaint,  Respondent purchased automobiles, evacuated and collected gasoline, batteries, mercury, catalytic converters and tires with aluminum wheels.  After removing these items it crushed cars for delivery to a shredding company.   It received approximately 100 vehicles per day in 2008.

29.     At all times relevant to this Complaint Respondent's operations generated liquids

such as engine and crankcase oils, anti-freeze, transmission and power steering fluids and windshield wiper fluid from its automobile crushing operations. These fluids were not removed from automobiles prior to crushing.

30.     Respondent is a corporation and therefore is a "person" as defined by 329 IAC § 3.1-4-1 [40 C.F.R. 260.10], and Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

31.     On or about April 2, 2008, EPA conducted an inspection at the Summit Site. During this inspection EPA inspectors observed two car crushers. The first car crusher was located on a large cement pad east of the entrance and next to the fence along the side of Industrial Highway. The second car crusher was located on a second pad further southeast. See Exhibits 2 and 3.

32.     Used oil and other automobile fluids were stored near the large cement pad in several containers and on two drip pads. The containers were unmarked. Cars were stacked 2-3 vehicles high on drip trays on the pad. The pad was sloped toward the center to a drain. The drain was connected to an oil-water separator. See Exhibit 4. The oil-water separator was releasing liquids outside of the pad to the ground.

33.     The crusher located at the northwest end of the Site was being drained of hydraulic oil into a five gallon pail. See Exhibit 5. There were other pails with oily residue near the crusher. These containers were unmarked.

34.     Further southeast, there was a second crusher and a horizontal gray tank used to store used oil from the crusher. The crusher hydraulic oil drained into a five gallon bucket which was unmarked. There was a metal containment structure which consisted of 4 sides a floor and no top located near the second crusher. The containment structure was covered by a blue tarp

which was weighted down with tires.  The gray tank and the drums in the containment structure were unmarked.   Between the crusher pad and the fence, there was a pile of tires, and a large puddle of greenish fluid with a sheen.  See Exhibit 6.

35.     Once crushed, the cars were placed in metal pans where the fluids were drained further.  See Exhibit 7.

36.     Crushed cars were shrink wrapped and stacked on-site.  During the inspection EPA inspectors observed crushed vehicles with oil dripping on their sides; wooden pallets and the ground beneath the crushed vehicles saturated with oil.  See Exhibit 8.

37.     Further southeast along Industrial Highway there was a three sided shed ("gasoline recovery shed" or "shed") where Respondent drained gasoline from cars prior to crushing.  The process involved using a spike over a catch basin above the pad so that a front-loader or fork lift could impale a car's gasoline tank.  The gasoline would drain by gravity to a 2,500 gallon horizontal tank.  See Exhibit 2 area delineated as "Canopy" and Exhibit 9. The gasoline was stored in a 2,500 gallon horizontal tank.

38.     After the gasoline was drained Respondent crushed the auto.  Additional automotive fluids such as crankcase oil, transmission fluid and brake fluid, drain to the crusher pad and car trays.

39.     There were plastic totes full of auto batteries located at the Site during the April 2008 inspection.  Some of the totes were filled with liquids.  One tote had a two inch opening at the bottom.  Batteries were also stored in the back of a pick-up truck.  Some of these batteries were cracked open.  Respondent could not identify the liquids in the tote at that time.  These containers were unmarked. See Exhibit 10.

40. Next to the tote there were two five gallon un-marked buckets that contained mercury switches. See Exhibit 11.

41. Respondent stored several 55 gallon drums located inside and outside the area near the shed. During the April 2008 inspection EPA observed a Beaver Oil Company truck pumping liquids from the unlabelled drums into a tanker truck. The driver informed EPA that he was pumping out used oil and that he had already pumped out 11 drums of used oil. There were 19 more drums remaining. None of the drums were marked. See Exhibit 12.

42. The EPA inspectors conducted an exit interview at the conclusion of the inspection. The EPA inspectors informed the Respondent of their observations including, but not limited to, concerns about the management of used oil and batteries, the leaks and drips of automotive fluids on the ground and the lack of proper labeling. The EPA inspectors did not conduct a record review while on-site.

43. On or about July 7, 2008, EPA issued to Respondent an information request under Section 3007 of RCRA. Among other things, EPA requested the Respondent to identify the wastes generated at the site. EPA also requested the Respondent to provide copies of any and all waste analyses conducted on the waste generated at the site and other documents needed to conduct a record review.

44. On or about August 15, 2008, Respondent submitted a response to EPA's information request. In the response, Respondent stated that: a) the waste generated at the Site consisted of used oil, antifreeze and other car fluids from the crushing operations; b) these waste streams were collected in various containers including buckets, drip pans and drums and transferred to above ground storage tanks and then taken by Beaver Oil Co., Inc., located in

Hopkins, Illinois with a bill of lading; c) that the oil water separator collected rain water and automotive fluids from the crushing operation; d) that Respondent removed the oil water separator in June of 2008; e) that Respondent had not conducted any waste analysis on any of the automotive fluid wastes generated at the site but instead relied upon the waste analysis conducted by Beaver Oil; f) that Respondent had not conducted an analysis of the liquid wastes accumulated in the battery storage totes; g) that Respondent had discontinued use of the totes; h) that spills of automotive fluids are cleaned up daily with oil dry and placed in garbage boxes; and i) the batteries in the totes were picked-up by T&S Trading, Inc.

45.　On or about July 24, 2008, EPA issued an information request under Section 3007 of RCRA to Beaver Oil Co., Inc. (Beaver Oil).

46.　EPA asked Beaver Oil to submit information on the amounts and types of waste received from the Summit Site for the time period of January 1, 2008 to the date of the receipt of the request.

47.　On August 27, 2008, EPA received Beaver Oil's response which was dated August 19, 2008.

48.　For the time period mentioned in Paragraph 46, Beaver Oil received from Respondent approximately 27,771 gallons of liquid wastes segregated by Beaver Oil as three separate waste streams – used oil, antifreeze and gasoline.

49.　Beaver Oil received approximately 11,871 gallons of used oil and antifreeze and 15,900 gallons of gasoline. It tested these liquid waste streams only for flash, bottom, sediments and water and pH. It did not test these liquid waste streams using the TCLP test method.

50.　Beaver Oil sold the liquids identified in paragraph 48. The used oil was sold to

industrial burners. The antifreeze was sold to a broker in the antifreeze recycling industry. The gasoline was sold to a refiner of motor fuels.

51.     EPA issued an information request under Section 3007 of RCRA to T&S Trading, Inc. (T&S).

52.     On August 12, 2008, T&S submitted a response to EPA's Section 3007 RCRA information request. T&S indicated that it collected only the batteries and shipped them to Gopher Resources Corp. It did not collect the totes or the liquids in them. It did not test these liquids but indicated that it thought they were battery acids.

53.     On March 18, 2009, EPA conducted a sampling inspection at the Summit Site.

54.     During the sampling inspection EPA collected several samples from the liquids stored in or around the gasoline recovery shed and observed conditions at the site.

55.     EPA observed that the area where the oil water separator was located during the April 2, 2008, inspection had been paved over. There was a new shredder. Throughout the Site there were large piles of crushed vehicles. The cars had staining and dripping of brownish liquids such as oils from the automobiles. The same staining occurred on the soils near them. The soils were saturated such that it looked like they had been there for a while with the automotive liquids in them.

56.     EPA observed a metal box with two 55-gallon drums located east of Crusher #1. The box was half full of a brownish liquid with an oily sheen. The box and drums were unmarked. Exhibit 13. EPA inspectors took samples from the metal box (3180901 and 3180902) and the drums (3180903 and 3180904).

57.     In the gasoline recovery shed EPA observed a large green tank, a smaller red tank

11

and approximately 39 drums. The green tank was placed inside a steel box. Inside the steel box there was over one foot of a reddish liquid. There was a gasoline or diesel fuel smell near the box. Exhibit 14

58.     The 39 drums were unmarked and most of them appeared to be filled with a liquid. EPA collected samples from 4 drums within the gasoline recovery shed – drum 1 (3180905, 6 and 7), drum 2 (3180908, 9 and, 10), drum 3 (3180911, 12 and 13) and drum 4 (318090914, 15 and 16).

59.     EPA inspectors observed a steel box filled with car batteries near the gasoline recovery shed. Several batteries were broken with the lead plates exposed. There were no markings on the steel box. Exhibit 15.

60.     In the area of the gasoline recovery shed EPA observed a horizontal red tank inside a box on a concrete pad. There was dirt saturated with what appeared to be oil. EPA collected a sample of the soils in this area (31890917, 18, 23 and 24).

61.     In the area between crushed cars and the shredder EPA observed a pool of water with an oil sheen. The soil in front of the water was dark and appeared to be stained with oil. The soils were also saturated with liquids such as automotive oils. EPA collected two soil samples in this area. (31890922 and 23). See Exhibit 16.

62.     The samples were analyzed by EPA's Region 5 Chicago Regional Laboratory.

63.     According to EPA's analysis the four drums sampled contained benzene concentration above the regulatory level of 0.5 mg/L. Specifically, sample # 3180905 collected from Drum 1 had a benzene concentration of 4.30 mg/L; sample # 3180908 collected from Drum 2 had a benzene concentration of 14.2 mg/L; sample # 3180911 collected from a Drum 3 had a

benzene concentration of 213 mg/L; sample # 3180914 collected from Drum 4 had a benzene concentration of 1,080 mg/L.

64.     EPA's analysis of Drum 3 indicates that it contained waste with a flash point below 140 °F.  Specifically sample # 3180912 had a flash point of 76.9 °F.

65.     On September 15, 2009, EPA sent Respondent another RCRA 3007 information request.  On October 6, 2009, Respondent submitted a response and identified the contents of these drums as waste oils from the drain pad.  According to the Respondent the waste oil was generated from the crusher area drain pads. They were placed into the drums between March 5, 2009, and March 18, 2009.  The drums were then pumped into a tank located on-site.  Beaver Oil picked up the contents of the tank and used a Bill of Lading.  Beaver Oil picked up 3,000 gallons of "oil" on or about March 21, 2009.

66.     The drums EPA sampled contained solid waste as defined by 329 IAC § 3.1-6-1 and 40 C.F.R. §261.2. The total amount of waste shipped off-site was approximately 2,145 gallons.

67.     A solid waste is a toxic hazardous waste under RCRA and designated with the hazardous waste code "D018" if it has a benzene concentration greater than 0.5 mg/L.  The four drums identified in paragraph 63 above were RCRA hazardous waste as defined by 329 IAC § 3.1-6-1 and 40 C.F.R. § 261.24.

68.     A solid waste is a flammable hazardous waste under RCRA and designated with the hazardous waste code "D001" if it has a flash point less than 140F.  Drum 3 identified in paragraph 63 above was RCRA flammable hazardous waste as defined by 329 IAC § 3.1-6-1 and 40 C.F.R. § 261.21.

69.     The Site is a "facility" as defined by 329 IAC § 3.1-4-1 and 40 C.F.R. § 260.10 since Respondent stored at the Site, for a temporary period of time, the drums of hazardous wastes identified in the preceding paragraph and other similar hazardous wastes.

70.     Respondent is, and was at all times relevant to this Complaint, the owner of the business and operated a variety of processes at its facility and thus was an owner or operator of a "facility" as defined by 329 IAC §§ 3.1-4-1 and 3.1-4-1(b), and 40 C.F.R. § 260.10.

71.     Respondent is, and was at all times relevant to this Complaint, a "generator" of used oil, solid and hazardous waste as defined in 329 IAC §§ 3.1-4-1, 3.1-6-1 and 13-3-1 and 40 C.F.R. §§ 260.10, 261.2, 261.3, 261.21, 261.24 and 279.1  since its processes produced wastes, including but not limited to, automotive fluids such as engine lubricating oils, gasoline, transmission fluids, anti-freeze, brake fluids and windshield washer fluid.

72.     By March 18, 2009, Respondent had not submitted a notification of hazardous waste activity form.

73.     On May 4, 2010, Respondent submitted to the Indiana Department of Environmental Management ("IDEM") a notification of hazardous waste activity form in which it claimed that it was a non-generator of hazardous waste.

74.     From at least March 18, 2009, Respondent was a large quantity generator (LQG) of hazardous waste even though it claimed that it did not generate hazardous wastes within the meaning of 329 IAC §§ 3.1-4-1, 3.1-6-1 and 3.1-7-1,  [40 C.F.R. §§ 260.10, 261.5(g) and 262.34].

75.     From at least March 18, 2009, Respondent was a used oil generator within the meaning of 329 IAC § 13-2,  [40 C.F.R. §279.1].

76.     From at least March 18, 2009, Respondent was a small quantity handler of universal waste within the meaning of 329 IAC § 3.1-16-1, [40 C.F.R. §273.9].

77.     Under 329 IAC §§ 3.1-6-1, 3.1-7-1, 3.1-13-1, 3.1-13-2 and 40 CFR §§ 261.5(g), 262.34(b), 270.1(c) and 270.10, a generator, including a small quantity generator, must apply for and obtain a hazardous waste storage permit if the generator fails to meet the requirements for a permit exemption.

78.     Under 329 IAC § 13-2, [40 C.F.R. § 279, Subpart C] Respondent as a used oil generator is subject to special management standards for the handling of used oil.

79.     Under 329 IAC § 3.1-16-1, [40 C.F.R. § 273, Subpart B] Respondent as a small quantity handler of batteries is subject to special management standards for the handling of universal waste.

80.     Respondent generated and managed hazardous waste at the Facility after November 19, 1980.

81.     At all times relevant to this Complaint, the State of Indiana had not issued a permit to Respondent to treat, store, or dispose of hazardous waste at its Facility.

82.     At all times relevant to this Complaint, Respondent did not have interim status for the treatment, storage, or disposal of hazardous waste at its Facility.

83.     In addition to the facts alleged above, based on information submitted by the Respondent, EPA has determined that the Respondent did not:

    a.  apply for or receive an EPA ID Number;
    b.  sample its own waste streams;
    c.  conduct hazardous waste or universal waste training as required by RCRA;

    d.  ship hazardous waste using the hazardous waste manifests as required by RCRA;

    e.  have a contingency plan as required by RCRA; or

    f.  document weekly inspections of hazardous waste storage areas.

84.     On February 24, 2014, EPA issued a Pre-filling Notice and Opportunity to Confer letter alleging certain violations of RCRA identified as a result of the inspections.

### Count 1: Failure to Determine if a Waste is a Hazardous Waste.

85.     Paragraphs 1 through 84 of this Complaint are incorporated herein as though set forth fully in this paragraph.

86.     The regulation at 329 IAC § 3.1-7-1 and 40 C.F.R. § 262.11 require that a person who generates a solid waste, as defined in 40 C.F.R. § 261.2, must determine if that waste is a hazardous waste.

87.     On March 18, 2009, the EPA inspector observed 39 55-gallon drums in and or around the gasoline recovery shed.

88.     The Respondent indicated that it mixed the contents of the 39 drums in a tank prior to the wastes being shipped off-site.  The Respondent identified the contents of the drums and the tank as waste oils.  However, based on EPA March 18, 2009, sampling inspection, at least four of the 39 drums were determined to be hazardous waste.  Further, based on Respondents description of the process (dripping fluids from automobiles) for generating the contents of the drums and the sampling results the other 35 drums should have been characterized as hazardous waste.  Finally, the contents of the tank became a hazardous waste when Respondent either deposited the contents of all of the drums into it or when the Respondent mixed the contents of the four drums with the 35 drums in the tank.

89.     Respondent did not make a correct hazardous waste determination on the liquids contained in the drums and tank as alleged above.

90.     Respondent as a result of its actions alleged in this Count 1 failed to comply with the waste determination requirements of 329 IAC § 3.1-7-1 and 40 C.F.R. § 262.11 for the drums and tank identified in this Count 1.

## Count 2:  Offering Hazardous Waste, for Transportation, without an EPA Identification Number.

91.     Paragraphs 1 through 84 of this Complaint are incorporated herein as though set forth fully in this paragraph.

92.     The regulations at 329 IAC §§ 3.1-7-1, 3.1-7-10, 3.1-7-11, 3.1-7-12 and 3.1-7-13 and 40 C.F.R. § 262.12(a) require that a generator must not treat, store, dispose of, transport, or offer for transportation, hazardous waste without having received an EPA identification number from the Administrator.

93.     Respondent received an EPA identification number on August 4, 2010.

94.     Respondent offered hazardous waste from the drums and accumulation tank in the GRA as alleged in paragraphs 63-65 on or about March 21, 2009, without having received an EPA identification number. At or about the same time, Respondent offered other shipments of hazardous waste as alleged in paragraph 57 for transportation, without having received an EPA identification number.

95.     Respondent's offering hazardous waste for transportation as alleged in the Count 2, without having received an EPA identification number, violated 329 IAC §§ 3.1-7-1, 3.1-7-10, 3.1-7-11, 3.1-7-12 and 3.1-7-13 [40 C.F.R. § 262.12(a)].

17

### Count 3: Failure to Ship Hazardous Waste on a Required Manifest.

96.     Paragraphs 1 through 84of this Complaint are incorporated herein as though set fully forth in this paragraph.

97.     The regulations at 329 IAC § 3.1-7-1 and 40 C.F.R. § 262.20(a) require that a generator who transports, or offers for transport, a hazardous waste for off-site treatment, storage, or disposal, or a treatment, storage, and disposal facility must prepare a manifest (OMB Control number 2050-0039) on EPA Form 8700-22, and, if necessary, EPA Form 8700-22A, according to the instructions included in the appendix to this part and must follow all requirements of the manifest.

98.     On or about March 21, 2009, Respondent failed to ship the hazardous waste contained in the four sampled drums, the 35 unsampled drums and the accumulation tank on a required manifest (EPA Form 8700-22).   At or about the same time, Respondent may have also offered other shipments of hazardous waste as alleged in paragraph 57 for transportation, without having received an EPA identification number.

99.     Respondent's failure to ship hazardous waste as alleged in this Count 3 on a required manifest (EPA Form 8700-22), violated 329 IAC § 3.1-7-1 and 40 C.F.R. § .262.20(a)

### Count 4 – Storing Hazardous Waste without a Permit or Interim Status.

100.     Paragraphs 1 through 84 are incorporated by reference as if fully presented in this paragraph.

101.     The regulations found at 329 IAC §§ 3.1-1-7 and 13-1, and 40 C.F.R § 270.1(c) require owners and operators of hazardous waste management units to have a permit for the storage of hazardous waste.  Section 3005(a) of RCRA,

42 U.S.C. § 6925(a) and the regulations at 40 C.F.R. Part 270, prohibit the treatment, storage, or disposal of hazardous waste by any person who has not applied for or received a permit.

102.    The contents of the 39 drums and the accumulation tank were shipped off-site as non-hazardous waste. Neither the drums nor the accumulation tank were labeled with the words "Hazardous Waste." While on-site these drums and the tank were in storage as that term is defined in 329 IAC §§ 3.1- 4-1 and 40 C.F.R. § 260.10.

103.    The area where the 39 drums and the accumulation tank were stored on-site was a hazardous waste management unit as defined by 329 IAC §§ 3.1-1-7 and 3.1-4-1, 40 C.F.R. § 260.10.  Respondent's facility, therefore, was a hazardous waste storage facility with a hazardous waste storage unit as defined by 329 IAC §§ 3.1- 4-1 and 40 C.F.R. § 260.10.

104.    Respondent owned or operated the equipment and hazardous wastes at its facility and was responsible for the overall operation of the facility and owned the equipment located therein. Respondent was an owner or operator as those terms are defined in 329 IAC §§ 3.1- 4-1 and, 40 C.F.R. § 260.10.

105.    Respondent did not have a permit or interim status to operate a hazardous waste storage unit at its facility. Consequently, Respondent was in violation of 329 IAC §§ 3.1-13-1 and 40 C.F.R. § 270.1(c) and Section 3005 of RCRA, 42 U.S.C. §6925.

106.    At all times relevant to this complaint, including, but not limited to March 18, 2009, Respondent was a generator of hazardous waste at its facility as that term is defined in 329 IAC §§ 3.1-1-7 and 4-1, 40 C.F.R. § 260.10.

107.    Generators storing hazardous waste in containers are required to label the containers with the words "Hazardous Waste," 329 IAC §§ 3.1-6-1 and 3.1-7-1, 40 C.F.R.

§§ 262.34(a)(3), 262.34(d)(3) and 261.5(g)(2).  On March 18, 2009, Respondent arranged for the shipment of the contents of the four sampled containers and the accumulation tank containing hazardous waste off-site as non-hazardous waste. Respondent failed to meet the conditions of 329 IAC §§ 3.1-1-6 and 3.1- 7-1 and 40 C.F.R. § 262.34(a)(3), 262.34(d)(3) and 261.5(g)(2) and therefore did not qualify for a permit exemption.

108.    Generators of hazardous waste in containers are required to comply with 40 C.F.R. 265, Part I, "Use and Management of Containers," 329 IAC §§ 3.1-6-1 and 3.1-7-1 and 40 C.F.R. § § 262.34(a)(1) 262.34(d)(3) and 261.5(g)(2). Facilities are required to conduct weekly inspections of the areas where the containers were stored pursuant to 40 C.F.R. § 265.174.

109.    During the March 18, 2009, inspection and subsequently, Respondent did not produce any records that it conducted weekly inspections as required by 40 C.F.R. § 265.174. Consequently, Respondent did not conduct the weekly inspections as required by 40 C.F.R. § 265.174.  Respondent failed to meet the conditions of 329 IAC §§ 3.1-6-1 and 3.1-7-1 and 40 C.F.R. §§ 262.34(a)(1), 262.34(d)(3) and 261.5(g)(2) and therefore did not qualify for a permit exemption.

110.    329 IAC §§ 3.1- 7-1, and, 40 C.F.R. §§ 262.34(a)(4) and 265.51 and 265.53 require a generator  to have a contingency plan.  Respondent did not have a contingency plan. Consequently, when it shipped the contents of the four drums and accumulation tanks off-site after March 18, 2009, Respondent did not meet the requirements of 329 IAC §§ 3.1- 7-1 and  40 C.F.R. §§ 262.34(a)(4), 265.51 and 265.53 and therefore did not qualify for a permit exemption.

111.    329 IAC §§ 3.17-1 and 10-1and 40 C.F.R. §§ 262.34(a)(4), 265.16 (a), (b) and (c) require a generator to provide initial and annual training for its employees with duties involving hazardous waste management that teaches them to perform their duties in a way that ensures compliance with 40 C.F.R. Part 265.  Respondent did not conduct this training. Consequently, Respondent failed to meet the conditions of 329 IAC §§ 3.1-7-1 and 10-1, 40 C.F.R. §§ 262.34(a)(4) and 265.16(a)-(c) and did not qualify for a permit exemption.

112.    329 IAC §§ 3.1-7-1, 40 C.F.R. §§ 265.16(d)(1) require a generator to maintain documentation that the training required by this section has been completed and a document that lists the job title for each position related to hazardous waste management and the name of the person filling that position. Respondent did not have this documentation. Consequently, Respondent failed to meet the conditions of 329 IAC §§ 3.1-1-7, 40 C.F.R. §§ 262.34(a)(4) and 265.16(d)(1) and did not qualify for a permit exemption.

113.    As alleged in paragraphs 1 through 84 above Respondent failed to comply with the conditions necessary for a generator to qualify for an exemption from the hazardous waste storage permit requirements under 35 IAC §§ 3.1-6-1 and 3.1- 7-1 and 10-1, 40 C.F.R. §§ 261.5(g) and 262.34. Respondent did not and does not have a permit for the storage of hazardous waste.  Consequently, Respondent did not meet the requirements of 329 IAC §§ 3.16-1 and    3.1-7-1 and 10-1; 40 C.F.R. §§261.5(g)(2) and 262.34(a) and did not qualify for a permit exemption. Consequently, Respondent violated 329 IAC §§ 3.1-13-1, 40 C.F.R. § 270.1(c).

## Count 5 – Storing Used Oil in Unmarked Containers.

114.     Paragraphs 1 through 84 are incorporated by reference as if fully presented in this paragraph.

115.     The regulations at 329 IAC § 3.13-4-3(d) [40 CFR 40 CFR § 279.22(c)(1)] require used oil stored in containers and tanks must be marked clearly with the words "Used Oil".

116.     On March 18, 2009, the EPA inspectors observed several 55-gallon drums containing used oil that were not marked with the words, "Used Oil". The drums included but were not limited to the 39 drums and accumulation tank located near the gasoline recovery shed that Respondent asserts contained used oil. The inspectors also observed a box containing liquids with an oil sheen (paragraph 56) that was not labeled.

117.     Respondent's failure to store used oil in containers marked with the words "Used Oil" violated IAC § 3.13-4-3(d) [40 CFR 40 CFR § 279.22(c)(1)].

## Count 6 – Respondent Failed to Contain Used Oil Releases.

118.     Paragraphs 1 through 84 are incorporated by reference as if fully presented in this paragraph.

119.     The regulations at 329 IAC § 3.13-4-3(e)(1)-(5) [40 CFR 40 CFR §§ 279.22(d)(1) –(4)] require a person who detects release of used oil to the environment, to stop the release, contain the released used oil, clean up and properly manage the released used oil and other materials, and, if necessary, repair or replace any leaking used oil storage containers or tanks prior to returning them to service.

120.    At the time of the March 18, 2009, inspection EPA inspectors observed releases of used oil on the ground throughout the facility including those areas described in paragraphs 55, 60 and 61.  It appeared that these oils had been there for a while and had not been cleaned-up or properly managed.

121.    At the time of the March 18, 2009, inspection EPA inspectors observed liquids in boxes identified in paragraphs 56 and 57.

122.    Respondent's failure to stop the release, contain the released used oil, clean up and properly manage the released used oil and other materials, and, if necessary, repair or replace any leaking used oil storage containers or tanks prior to returning them violated 329 IAC § 3.13-4-3(e)(1)-(5) [40 CFR 40 CFR §§ 279.22(d)(1) –(4)].

### Count 7 – Failure to Comply with the Standards for <br> Small Quantity Handlers of Universal Waste.

123.    Paragraphs 1 through 84 are incorporated by reference as if fully presented in this paragraph.

124.    329 IAC § 3.1-16-1, 40 C.F.R. § 273.13(a) requires a small quantity handler of universal waste to manage universal waste batteries in a way that prevents releases of any universal waste or component of a universal waste to the environment.

125.    At the time of the March 18, 2009, inspection EPA observed broken batteries in a box located on-site.  The box did not have a lid on it.

126.    Respondent's handling of the batteries as alleged in this Count 7 did not prevent the release to the environment of any universal waste component from the batteries and therefore was a violation 329 IAC § 3.1-16-1, 40 C.F.R. § 273.13(a).

127.    329 IAC § 3.1-16-1, 40 C.F.R. §273.15(c) requires a small quantity handler of universal waste to mark the containers with the accumulation start date or maintain an inventory system capable of determining when the accumulation was started.

128.    At the time of the March 18, 2009, inspection the container holding the batteries as alleged in paragraph 59 was not marked and the Respondent did not have an inventory system that met the requirements of 329 IAC § 3.1-16-1, 40 C.F.R. §273.15(c). Consequently, the Respondent was in violation of 329 IAC § 3.1-16-1, 40 C.F.R. §273.15(c).

129.    329 IAC § 3.1-16-1, 40 C.F.R. §273.16 requires a small quantity handler of universal waste to provide all employees who handle or manage the universal waste to have training.

130.    At the time of the March 18, 2009, inspection Respondent did not have a training program which met the requirements of 329 IAC § 3.1-16-1, 40 C.F.R. §273.16. Consequently, Respondent was in violation of 329 IAC § 3.1-16-1, 40 C.F.R. §273.16.

### Civil Penalty

The Complainant proposes, subject to the receipt and evaluation of further relevant information from Respondent, that the Administrator assesses a civil penalty of $263,375 for the violations alleged in this Complaint, as further explained in Attachment A, "Penalty Summary Sheet."

Complainant determined the proposed civil penalty according to RCRA Section 3008, 42 U.S.C. § 6928. In assessing a civil penalty, the Administrator of U.S. EPA must consider the seriousness of the violation and any good faith efforts to comply with applicable requirements. *See*, Section 3008(a)(3) of RCRA, 42 U.S.C. § 6928(a)(3). Complainant has considered the facts

and circumstances of this case with specific reference to U.S. EPA's 2003 RCRA Civil Penalty Policy. A copy of the penalty policy is available upon request. This policy provides a consistent method of applying the statutory penalty factors to this case.

## COMPLIANCE ORDER

Based on the foregoing, Respondent is hereby ordered, pursuant to the authority of Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and § 22.37(b) of the Consolidated Rules, 40 C.F.R. § 22.37(b) to comply with the following requirements immediately upon the effective date of this Order:

1.     Respondent shall maintain compliance with each of the regulations cited in this Complaint and Compliance Order. Respondent shall certify its compliance with each of these regulations within thirty (30) days of the date of the filing of this Complaint and Compliance Order by notifying EPA in writing.

2.     If Respondent has not taken or completed compliance with each of the regulations cited in this Complaint, Respondent shall notify EPA of the failure, its reasons for the failure, and the proposed date for compliance within thirty (30) days of the date of the filing of this Complaint and Compliance Order.

## Rules Governing this Proceeding

The Consolidated Rules, 40 C.F.R. Part 22, govern this proceeding to assess a civil penalty and order compliance. Enclosed with the Complaint served on Respondent is a copy of the Consolidated Rules.

## Filing and Service of Documents

Respondent must file with the U.S. EPA Regional Hearing Clerk the original and one

copy of each document Respondent intends as part of the record in this proceeding.  The

Regional Hearing Clerk's address is:

> Regional Hearing Clerk (E-13J)
> U.S. EPA, Region 5
> 77 W. Jackson Blvd.
> Chicago, Illinois  60604

Respondent must serve a copy of each document filed in this proceeding on each party

pursuant to Section 22.5 of the Consolidated Rules, 40 C.F.R. §22.5. Complainant has authorized

Richard J. Clarizio to receive any Answer and subsequent legal documents that Respondent

serves in this proceeding.  You may telephone Mr. Clarizio at (312) 886-0559. His address is:

> Richard J. Clarizio (C-14J)
> Associate Regional Counsel
> Office of Regional Counsel
> U.S. EPA, Region 5
> 77 W. Jackson Blvd.
> Chicago, Illinois  60604

### Terms of Payment

Respondent may resolve this proceeding at any time by paying the proposed penalty by

sending a certified or cashier's check payable to the "Treasurer, United States of America," to:

> U.S. EPA
> Fines and Penalties
> Cincinnati Finance Center
> P.O. Box 979077
> St. Louis, Missouri  63197-9000

Respondent must include the case name, docket number and the billing document number

on the check and in the letter transmitting the check. Respondent must simultaneously send

copies of the check and transmittal letter to the Regional Hearing Clerk and Richard J. Clarizio at

the addresses given above, and to:

Spiros Bourgikos (LR-8J)
Land and Chemicals Division
RCRA Branch
U.S. EPA, Region 5
77 W. Jackson Blvd.
Chicago, Illinois 60604

## **Answer and Opportunity to Request a Hearing**

If Respondent contests any material fact upon which the Complaint is based or the appropriateness of any penalty amount, or contends that it is entitled to judgment as a matter of law, Respondent may request a hearing before an Administrative Law Judge. To request a hearing, Respondent must file a written Answer within thirty (30) days of receiving this Complaint and must include in that written Answer a request for a hearing. Any hearing will be conducted in accordance with the Consolidated Rules.

In counting the 30-day period, the date of receipt is not counted, but Saturdays, Sundays, and federal legal holidays are counted. If the 30-day time period expires on a Saturday, Sunday, or federal legal holiday, the time period extends to the next business day.

To file an Answer, Respondent must file the original written Answer and one copy with the Regional Hearing Clerk at the address specified above.

Respondent's written Answer must clearly and directly admit, deny, or explain each of the factual allegations in the Complaint; or must state clearly that Respondent has no knowledge of a particular factual allegation. Where Respondent states that it has no knowledge of a particular factual allegation, the allegation is deemed denied. Respondent's failure to admit, deny, or explain any material factual allegation in the Complaint constitutes an admission of the allegation.

Respondent's Answer must also state:

    a.  the circumstances or arguments which Respondent alleges constitute grounds of defense;

    b.  the facts that Respondent disputes;

    c.  the basis for opposing the proposed penalty; and

    d.  whether Respondent requests a hearing.

If Respondent does not file a written Answer within 30 calendar days after receiving this Complaint, a default order may be issue, after motion, under Section 22.17 of the Consolidated Rules. Default by Respondent constitutes an admission of all factual allegations in the Complaint and a waiver of the right to contest the factual allegations. Respondent must pay any penalty assessed in a default order, without further proceedings, 30 days after the order becomes the final order of the Administrator of U.S. EPA under Section 22.27(c) of the Consolidated Rules.

## **Settlement Conference**

Whether or not Respondent requests a hearing, Respondent may request an informal conference to discuss the facts alleged in the Complaint and to discuss settlement. To request an informal settlement conference, Respondent may contact Spiros Bourgikos at (312) 886-6862.

Respondent's request for an informal settlement conference will not extend the 30-day period for filing a written Answer to this Complaint. Respondent may simultaneously pursue both an informal settlement conference and the adjudicatory hearing process. Complainant encourages all parties against whom it proposes to assess a civil penalty to pursue settlement through an informal conference. Complainant, however, will not reduce the penalty simply because the parties hold an informal settlement conference.

3/17/2014

Date

Margaret Guerriero, Director
Land and Chemicals Division

REGIONAL HEARING CLERK
RECEIVED
MAR 17 2014
U.S. ENVIRONMENTAL
PROTECTION AGENCY
REGION 5

29

**Complaint and Final Order**
**In the Matter of: Summit, Inc.**

**DOCKET NO:** RCRA-05-2014-0006

## CERTIFICATE OF SERVICE

I hereby certify that today I filed the original of this Complaint and Compliance Order (Complaint) docket number **RCRA-05-2014-0006** the Regional Hearing Clerk (E-19J), United States Environmental Protection Agency, Region 5, 77 W. Jackson Boulevard, Chicago, Illinois 60604, and that I mailed the second original copy to Respondent by Federal Express, addressed as follows :

> Mr. Mr. Coulopoulos
> Summit, Inc.
> 6901 West Chicago Avenue
> Gary, Indiana 46406

I certify that I delivered a correct copy of the Complaint by intra-office mail, addressed as follows:

> Regional Judicial Officer (C-14J)
> U.S. Environmental Protection Agency
> 77 W. Jackson Boulevard
> Chicago, Illinois  60604

On the ___17th___ day of **March. 2014**

_Spiros Bourgikos_

Spiros Bourgikos
Environmental Engineer
United States Environmental Protection Agency
Region V
Land and Chemicals Division   LM-8J
77 W. Jackson Blvd, Chicago, IL 60604-3590



REGIONAL HEARING CLERK
RECEIVED
MAR 17 2014
U.S. ENVIRONMENTAL
PROTECTION AGENCY
REGION 5

# EXHIBIT 2



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

MAR 1 0 2016

REPLY TO THE ATTENTION OF:

**CERTIFIED MAIL 7009 1680 0000 7669 1963**
**RETURN RECEIPT REQUESTED**

Mr. Peter Coulopoulos
General Manager
Summit, Inc.
6901 West Chicago Avenue
Gary, Indiana  46406

Re:  Consent Agreement and Final Order
　　 Summit Inc., Gary, Indiana
　　 Docket No:  RCRA-05-2014-0006

Dear Mr. Coulopoulos:

Enclosed please find a copy of the signed fully-executed Consent Agreement and Final Order (CAFO) in resolution of the above case.  The original was filed on March 10, 2016, with the Regional Hearing Clerk (RHC).   The CAFO is binding on Summit, Inc. (Summit).  Summit is required to complete the work required by the CAFO.

Please submit all deliverables required to be submitted to EPA to:

　　 Spiros Bourgikos (LR-8J)
　　 RCRA Branch
　　 U.S. EPA, Region 5
　　 77 West Jackson Boulevard
　　 Chicago, Illinois. 60604

Please pay the civil penalty in the amount of $263,375 in the manner prescribed in paragraph 10 of the CAFO, and reference all checks with the docket number RCRA-05-2014-0006.  Your payment is due within 30 calendar days of the effective date of the CAFO.

Also enclosed is a *Notice of Securities and Exchange Commission Registrant's Duty to Disclose Environmental Legal Proceedings.* Thank you for your cooperation in resolving this matter.

Sincerely,

Gary J. Victorine, Chief
RCRA Branch

Enclosure

cc: Mark Thiros, Esq.
    Thiros & Thiros, PC

    Nancy Johnston, Indiana Department of Environmental Management
    (njonston@idem.in.gov)

## NOTICE OF SECURITIES AND EXCHANGE COMMISSION REGISTRANTS' DUTY TO DISCLOSE ENVIRONMENTAL LEGAL PROCEEDINGS

Securities and Exchange Commission regulations require companies registered with the SEC (e.g., publicly traded companies) to disclose, on at least a quarterly basis, the existence of certain administrative or judicial proceedings taken against them arising under Federal, State or local provisions that have the primary purpose of protecting the environment. Instruction 5 to Item 103 of the SEC's Regulation S-K (17 CFR 229.103) requires disclosure of these environmental legal proceedings. For those SEC registrants that use the SEC's "small business issuer" reporting system, Instructions 1-4 to Item 103 of the SEC's Regulation S-B (17 CFR 228.103) requires disclosure of these environmental legal proceedings.

If you are an SEC registrant, you have a duty to disclose the existence of pending or known to be contemplated environmental legal proceedings that meet any of the following criteria (17 CFR 229.103(5)(A)-(C)):

    A. Such proceeding is material to the business or financial condition of the registrant;
    B. Such proceeding involves primarily a claim for damages, or involves potential monetary sanctions, capital expenditures, deferred charges or charges to income and the amount involved, exclusive of interest and costs, exceeds 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis; or
    C. A governmental authority is a party to such proceeding and such proceeding involves potential monetary sanctions, unless the registrant reasonably believes that such proceeding will result in no monetary sanctions, or in monetary sanctions, exclusive of interest and costs, of less than $100,000; provided, however, that such proceedings which are similar in nature may be grouped and described generically.

Specific information regarding the environmental legal proceedings that must be disclosed is set forth in Item 103 of Regulation S-K or, for registrants using the "small business issuer" reporting system, Item 103(a)-(b) of Regulation S-B. If disclosure is required, it must briefly describe the proceeding, "including the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceedings and the relief sought."

You have been identified as a party to an environmental legal proceeding to which the United States government is, or was, a party. If you are an SEC registrant, this environmental legal proceeding may trigger, or may already have triggered, the disclosure obligation under the SEC regulations described above.

This notice is being provided to inform you of SEC registrants' duty to disclose any relevant environmental legal proceedings to the SEC. This notice does not create, modify or interpret any existing legal obligations, it is not intended to be an exhaustive description of the legally applicable requirements and it is not a substitute for regulations published in the Code of Federal Regulations. This notice has been issued to you for information purposes only. No determination of the applicability of this reporting requirement to your company has been made by any governmental entity. You should seek competent counsel in determining the applicability of these and other SEC requirements to the environmental legal proceeding at issue, as well as any other proceedings known to be contemplated by governmental authorities.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 5



In the Matter of:

Summit, Inc.
Gary, Indiana

Respondent.

Docket No.  RCRA-05-2014-0006

Proceeding to Assess a Civil Penalty
Under Section 3008(a) of the Resource
Conservation and Recovery Act,
42 U.S.C. § 6928(a)

## Consent Agreement and Final Order

### Preliminary Statement

1.      Complainant, the Director of the Land and Chemicals Division, United States
Environmental Protection Agency (U.S. EPA), Region 5, brought this administrative action
seeking a civil penalty under Section 3008(a) of the Solid Waste Disposal Act, as amended, also
known as the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928(a).

2.      On March 17, 2014, U.S. EPA filed the Complaint in this action against Respondent
Summit, Inc.  The Complaint alleges that Respondent violated Sections 3002-3005, 3006 and
3014 of RCRA, 42 U.S.C. § 6922-6925, 6926 and 6935, at its facility in Gary, Indiana.

3.      Respondent filed an Answer on April 17, 2014, and requested a hearing under
Section 3008(b) of RCRA, 42 U.S.C. § 6928(b), and 40 C.F.R. § 22.15.

### Stipulations

4.      Respondent withdrew its answer on March 8, 2016.  Respondent admits the
jurisdictional allegations in the Complaint and paragraphs 1 to 130 of the Complaint.

5.      Respondent has stipulated to the authenticity and admissibility of Complainant's
exhibits CXs 4, 4A, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 26, 27, 28, 30, 32, 44, 52,
53, 55 (pages 1573 through 1588), 56, 57, 58, 59, 61, 62, and 63.

6.     Respondent waives any right to contest the allegations in the Complaint and its right to appeal this Consent Agreement and Final Order (CAFO).

7.     Respondent certifies that it is complying fully with RCRA, 42 U.S.C. §§ 6901 – 6992k and the applicable regulations.

8.     Respondent consents to the assessment of the civil penalty specified in this CAFO and to the terms of this CAFO.

9.     The parties agree that settling this action without further litigation, upon the terms of this CAFO, is in the public interest.

### Civil Penalty

Within 30 days after the effective date of this CAFO, Respondent must pay the $263,375 civil penalty for the RCRA violations by sending a cashier's or certified check, payable to the "Treasurer, United States of America," to:

> U.S. EPA
> Fines and Penalties
> Cincinnati Finance Center
> P.O. Box 979077
> St. Louis, MO  63197-9000

[for checks sent by express mail]
> U.S. Bank
> Government Lockbox 979077 U.S. EPA Fines and Penalties
> 1005 Convention Plaza
> Mail Station SL-MO-C2-GL
> St. Louis, MO  63101

The check must state In the Matter of Summit, Inc. and the docket number of this CAFO.

10.     A transmittal letter stating Respondent's name and the case docket number must accompany the payment.  Respondent must send a copy of the check and transmittal letter to:

2

Regional Hearing Clerk (E-19J)
U.S. EPA, Region 5
77 West Jackson Blvd.
Chicago, IL  60604

Spiros Bourgikos (LR-8J)
RCRA Branch
U.S. EPA, Region 5
77 West Jackson Blvd.
Chicago, IL  60604

Richard Clarizio (C-14J)
Office of Regional Counsel
U.S. EPA, Region 5
77 West Jackson Blvd.
Chicago, IL  60604

11.   This civil penalty is not deductible for federal tax purposes.

12.   If Respondent does not timely pay the civil penalty, U.S. EPA may bring an action
to collect any unpaid portion of the penalty with interest, handling charges, nonpayment
penalties, and the United States enforcement expenses for the collection action.  The validity,
amount, and appropriateness of the civil penalty are not reviewable in a collection action.

13.   Pursuant to 31 C.F.R. § 901.9, Respondent must pay the following on any amount
overdue under this CAFO.  Interest will accrue on any overdue amount from the date payment
was due at a rate established by the Secretary of the Treasury pursuant to 31 U.S.C. § 3717(a)(1).
Respondent must pay a $15 handling charge each month that any portion of the penalty is more
than 30 days past due.  In addition, Respondent must pay a 6 percent per year penalty on any
principal amount 90 days past due.

## Compliance Plan

14.   Respondent shall develop and implement a Contingency Plan pursuant to 329 IAC
3.1-7-1 (40 CFR 262.34(a)(4), 265.51 and 265.53) and an Employee Training Plan that complies
with 329 IAC 3.1-7-1 and 10-1 (40 CFR 262.34(a)(4), 265.16(a)-(c) and 265.16(d)(1),

3

268.7(a)(5)). The Plans shall address hazardous waste, used oil and universal wastes. The Respondent shall submit new versions of these Plans to EPA for review and approval within 30 days of the effective date of this CAFO. These plans shall identify all crushers that the Respondent owns or operates and their location (name of company, street address, city, state and zip code).

15. Respondent shall submit to EPA within 30 days of the effective date of this CAFO a list of all crushers that it owns or operates and their location at that time. It shall include the location the name and address of where the crusher is located. Respondent shall identify which if any of these crushers are leased. For non-leased crushers the Respondent shall maintain a daily log of the location of the crusher and the transporter of any waste streams generated from the operation of the crusher. The Respondent shall submit a quarterly report of these daily logs to EPA up until one year of the effective date of this CAFO.

16. The Respondent shall label all containers of hazardous waste, used oil and universal waste in accordance with 329 IAC 3.1-6-1 and 3.1-7-1, (40 CFR 262.34(a)(3) and (d)(3)) and 329 IAC 13-4-3(d) (40 CFR 279.22(c)(1)) and 329 IAC 3.1-16-1 (40 CFR 273.14(a) and 15(c)).

17. Respondent shall submit a Notification of Regulated Waste Activity, EPA SF 8700-12 (Notification), to EPA and IDEM within 15 days of the effective date of this CAFO. The Notification shall be complete. Respondent shall include in the Notification that it is a storage facility of hazardous waste and a large quantity generator.

18. Respondent shall submit to EPA and IDEM for review and approval a closure plan for areas A and B as marked on Exhibit 1. The Closure Plan shall comply with 329 IAC 3.1-11.1-7. Respondent shall implement the closure plan in accordance with the schedule and plan approved or modified by IDEM.

**General Provisions**

19.   This CAFO resolves only Respondent's liability for federal civil penalties and injunctive relief for the violations alleged in the Complaint.

20.   This CAFO does not affect the right of U.S. EPA or the United States to pursue appropriate injunctive or other equitable relief or criminal sanctions for any violation of law.

21.   This CAFO does not affect Respondent's responsibility to comply with RCRA and other applicable federal, state, and local laws and permits.

22.   This CAFO is a "final order" for purposes of 40 C.F.R. § 22.31, U.S. EPA's RCRA Civil Penalty Policy, and U.S. EPA's Hazardous Waste Civil Enforcement Response Policy (December 2003).

23.   The terms of this CAFO bind Respondent, its successors, and assigns.

24.   Each person signing this agreement certifies that he or she has the authority to sign for the party whom he or she represents and to bind that party to its terms.

25.   Each party agrees to bear its own costs and attorneys' fees in this action.

26.   This CAFO constitutes the entire agreement between the parties.

**Summit, Inc., Respondent**

3/8/16

Date

Peter Coulopoulos, General Manager
Summit, Inc.

5

**United States Environmental Protection Agency, Complainant**

_3/08/2016_
Date

Margaret M. Guerriero
Director
Land and Chemicals Division

**In the Matter of:**
**Summit, Inc.**
**Docket No. RCRA-05-2014-0006**

<u>**Final Order**</u>

This Consent Agreement and Final Order, as agreed to by the parties, shall become effective immediately upon filing with the Regional Hearing Clerk.  This Final Order concludes this proceeding pursuant to 40 C.F.R. §§ 22.18 and 22.31.  IT IS SO ORDERED.

March 9, 2016
Date

Robert A. Kaplan
Acting Regional Administrator
United States Environmental Protection Agency
Region 5

7

In the matter of:   Summit, Inc.
Docket Number:  RCRA-05-2014-0006

## CERTIFICATE OF SERVICE

I certify that I served a true and correct copy of the foregoing **Consent Agreement and Final Order**, which was filed on March 10, 2016, this day in the following manner to the addressees:

Copy by certified mail
return-receipt requested:                     Peter Coulopoulos
                                              Summit, Inc.
                                              6901 West Chicago Avenue
                                              Gary, Indiana 46406

Copy by e-mail to
Attorney for Complainant:                     Richard Clarizio
                                              clarizio.richard@epa.gov

Copy by e-mail to
Regional Judicial Officer:                    Ann Coyle
                                              coyle.ann@epa.gov

Dated:  March 10, 2016

                                              LaDawn Whitehead
                                              Regional Hearing Clerk
                                              U.S. Environmental Protection Agency, Region 5

CERTIFIED MAIL RECEIPT NUMBER: **7009 1680 0000 7669 1963**

Exhibit 1



### Parcel Boundaries for
### Summit Inc., 6901 West Chicago Ave, Gary, IN 46406

| PARCEL # | PARCEL ID |
|----------|-----------|
| 1 | 450326451010000000004 |
| 2 | 450326451008000000004 |
| 3 | 450326451006000000004 |
| 4 | 450326451007000000004 |
| 5 | 450326451005000000004 |
| 6 | 450326451004000000004 |

0    250    500 Feet

Imagery: USDA NAIP Summer 2008
US EPA R5 LCD: LS 2/10/16

CX 001721

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
*(U.S. Government Not a Party)*

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:** ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
_____ .


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| _____ | |
| *Plaintiff(s)* ) | |
| v.  ) | Civil Action No. |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| *Defendant(s)* ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                  *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc: